HOWARD B. LATOURETTE v. MORTIMER D. GARDNER AND SARAH A. GARDNER.

*Foreclosure of mortgage—Discharge—Forgery.*

In this case, on a review of the testimony, the agreement produced by the defendants, purporting to be signed by the mortgagee, and which is claimed to discharge the mortgage sought to be foreclosed, is found to be genuine, and the decree below dismissing complainant's bill and decreeing affirmative relief to defendants is affirmed. No questions of law are involved.

Appeal from Livingston. (Newton, J.) Argued April 24, 1889. Decided June 7, 1889.

Bill to foreclose a mortgage. Decree dismissing bill, and directing complainant to discharge the mortgage, affirmed. The facts are stated in the opinion.

*Luke S. Montague (J. L. Topping,* of counsel), for complainant.

*Rollin H. Person, D. Shields,* and *C. Tinker,* for defendants.

LONG, J. The bill was filed in this cause on the twenty-second day of November, 1886, for the purpose of foreclosing a mortgage held by complainant as assignee of the personal representative of Timothy A. Wightman, deceased, late of Herkimer county, New York, who died on July 28, 1882, leaving a last will and testament, which was duly admitted to probate in the surrogate court for Herkimer county, and afterwards ancillary administration committed to Cyrus D. Wightman, by the probate court of Livingston county, this State.

The mortgage is upon 80 acres of land in the township of Tyrone, Livingston county, which is owned by Mortimer D. Gardner. A part of the original mortgaged premises was released on October 21, 1875.

The mortgage bears date April 5, 1871, and was given to secure the payment of the sum of $2,464 in five years after date, with interest, payable annually, at 10 per cent.

The interest had been kept up to October 21, 1881, but no part of the principal paid. The interest for the years 1882 and 1883 was paid together in the month of December, 1883, to Mrs. Katherine Wightman, the widow of deceased, and the annual interest was paid each year until October 21, 1886, but no part of the principal ever paid.

Complainant asks for the amount of principal, and interest thereon from October 21, 1886, aggregating on April 21, 1889, $2,925 22.

The defendants make no claim of the payment of any part of the principal in money, but produce a paper, claimed by them to have been made by Timothy A. Wightman in his

life-time, bearing date October 21, 1881, and reading as follows:

"To whom this may come.

"I hereby agree that the mortgage I hold against M. D. Gardner and on said Gardner's farm in Tyrone, Livingston county, Michigan, is to run the coming five years; then to be discharged from record in full, providing the interest is paid annually at seven per cent. per annum on all sums unpaid on the above mortgage.

"*Tyrone, October 21, 1881.*          T. A. WIGHTMAN."

The complainant insists that this paper was never executed by T. A. Wightman; that it was forged by the defendant Mortimer D. Gardner, or by his procurement.

It is admitted that if this paper is genuine the complainant has no standing in court, as the interest was paid by defendant annually on the mortgage for the five years following that date.

On the hearing in the court below the learned circuit judge dismissed complainant's bill, with costs.

It appears that Timothy A. Wightman was the half-brother of Amilo Gardner, the father of defendant Mortimer D. Gardner. Timothy A. Wightman's first wife was an aunt of the mother of defendant Mortimer D. Gardner. T. A. Wightman's first wife died several years ago, and in 1870 he married Mrs. Katherine Wightman, with whom he was living at the time of the execution of the paper to Mortimer D. Gardiner. Mrs. Katherine Wightman is still living. Next to his own children, Amilo Gardner and his children were the nearest blood relations of Mr. Wightman.

Mr. Amilo Gardner moved into Livingston county in 1851 or 1852, and has, with his family, ever since resided there. His family consisted of his wife and several children; Mortimer D. Gardner being one of the sons. The wife of Amilo Gardner died sometime in the summer of 1881.

Soon after the removal of Amilo Gardner to Livingston county, Mr. Wightman began to visit Livingston county from

his home in Herkimer county, New York, for the purpose of loaning money upon mortgages on farms in Livingston county and other surrounding counties. He made his home with Amilo Gardner during his visits to Michigan, sometimes staying three or four weeks, and at times three months. As he began to loan more money, his visits were made twice a year,—in the spring and fall,—always staying with Amilo Gardner. During these visits Mortimer D. Gardner took him from place to place to make loans, to the register's office to examine titles, and to other places, as Wightman wished and directed. During his absence from the State Mortimer D. Gradner looked after his interest in Michigan, found places to loan money, and appeared to be the agent of Wightman here in all his business transactions. Wightman finally took the loan on the farm of Mortimer D. Gardner in 1871, which was to run five years, for the sum before mentioned.

On or about November 14, 1881, while Wightman was at the house of Amilo Gardner on one of his semi-annual visits and business, it appears that Mortimer ·wanted a loan of $100 from Wightman, and called upon him at his father's house, some little distance from his farm, upon which he resided. The wife of Wightman was then with him, and objected to her husband making the loan to Mortimer, but finally, under her husband's direction, drew up the note for $100, which Mortimer signed, and received the money.

Mr. Amilo Gardner says that after this transaction he told Mr. Wightman that Mortimer felt pretty bad about his affairs with him, and at what Katherine had said, when Wightman said he would go down to Mortimer's house, and see him about it; that he went, and was gone about an hour, and when he returned he said he had made it all right with Mortimer; that he had given him a writing which made everything all right with him; but he did not know what kind of writing he had given him until after Wightman died.

Mr. Amilo Gardner further says that during all these years he had made no charges against Wightman for his staying there, and that Wightman said if he outlived him he would do well by him and his family.

The daughter of the defendant, now 19 years of age, testified that she remembered Mr. Wightman coming to her father's house on one occasion, when a paper was given from Wightman to her father. He came in the house and asked for paper, pen, and ink. Her father got the paper, but Wightman did not like the piece given to him, took some from his pocket, wrote upon it, and then read it. While she could not tell how it read, she did remember that Wightman then said in five years it would discharge the mortgage; all they had to do was to go to Howell, pay 10 cents, and have it discharged. She then saw the paper. The paper was handed to her father, and she afterwards saw the paper in the house, and, being shown the paper heretofore set out, says, "That looks like the same paper." Some words were written on the back of the paper, which the daughter says were put on by her mother the same day the paper was given her father.

Mr. Clarence Tinker, an attorney residing at Fenton, Genesee county, was called as a witness by the defendants, and testified that this contract signed by Mr. Wightman was exhibited to him by defendant Mortimer D. Gardner in February, 1882, and that Mr. Gardner then consulted him in regard to it, and what it was best to do with it; that he took it, inclosed it in an envelope, indorsed upon the envelope, "M. D. Gardner; to be delivered to him in person only," and then went with Mr. Gardner, and deposited the same in Mr. Buckbee's bank at Fenton.

The envelope, with this contract, was exhibited to him, and the witness says the indorsement on the envelope, as above, is in his handwriting, and made by him on the day above

stated,—February 2, 1882. This was before the death of Mr. Wightman.

A large number of witnesses were examined by the defendants, many of whom had seen Mr. Wightman write, and were familiar with his handwriting, who testified that the paper under which defendants claimed the mortgage was satisfied and discharged was in the handwriting of Mr. T. A. Wightman,—the body of the paper as well as the signature. Testimony was also given by the defendants tending to show that Mr. Wightman stated at different times that he intended to do something for Mortimer.

Dr. Aaron W. Riker testified that Mr. Wightman told him in 1881 that Mortimer had assisted him, and he was going to reward him for it.

Mr. Harrison T. Love testified that three days before Wightman died he told him that he had fixed it in black and white so Mortimer and Sarah could not be turned out of doors.

Mr. Elisha Griswold testified that in the fall of 1881, at Fenton, Mr. Wightman told him that Mortimer had done a great deal for him; that, though he had only one team, he would take it off the wagon or plow, and go with him to assist him in any business transaction; that he had never in all these years paid Mortimer anything; and that the mortgage he intended to fix before his death so that no parties could turn Mortimer and Sarah out of doors. He said he had some time before fixed a discharge on Mortimer's farm, but that his wife objected, and he had to change it for the time being; but that he intended, before his death, to have it the same as it was before.

Mr. George Russell testified that Mr. Wightman told him that Mortimer had always done a good deal for him, helping in his business; that Mortimer was all right now, and that he had something to show that he was all right now.

The complainant claims that these witnesses are not

worthy of credit, and gave some testimony tending to show contradictory statements made by some of them out of court to other parties.    Complainant gave testimony, also, tending to show that Mr. Wightman some time before his death had lost confidence in Mortimer, and did not intend doing anything for him.    Some considerable testimony was also given by complainant by witnesses as to the handwriting of Mr. Wightman; some by persons who had seen Mr. Wightman write, and others by comparison of the paper with other writings and signatures of Mr. Wightman, conceded to be genuine.    These witnesses give opinions that the paper in question is not in the handwriting of Mr. Wightman.

The complainant took the testimony of Mrs. Katherine Wightman, by commission, in Herkimer county, New York, as well as several other witnesses there.    Mrs. Wightman produced an unsigned paper writing on her examination, and the same was put in evidence, and reads as follows:

"To whom this may come.

"I hereby agree that the mortgage I hold against M. D. Gardner and on said Gardner's farm in Tyrone, Livingston county, Michigan, the interest the next five years from date is to be seven per cent., providing the interest is paid annually on all sums unpaid on said mortgage.

"*Tyrone, Oct. 21, 1881.*"

Mrs. Wightman testified in relation to this paper that in November, 1881, while she and her husband were at the house of Amilo Gardner, she heard Mortimer D. Gardner say to her husband that his father had given him the use of 20 acres of land, and if he (witness' husband) would reduce the interest on the mortgage to 7 per cent. he could make money enough to pay up the mortgage in about five years; that soon after the conversation her husband informed her that he had given Gardner a writing reducing the rate of interest upon this mortgage to 7 per cent., and that her husband then handed her the paper, which he said was a copy of the paper he had given to Mortimer, and asked her to copy

it, and preserve such copy so made by her with the other papers relating to the mortgage, which she did, all but the signature.

This is the copy made by Mrs. Wightman, and in her handwriting, which is above set out.

The claim of counsel for complainant here is that, if Wightman gave Mortimer a paper such as his wife now testifies to, Mortimer drew or caused to be drawn from it, imitating the handwriting of Wightman, the paper which he now produces, and under which he claims a discharge of the mortgage.

It will be noticed that the two papers read exactly alike down to and including the word "Michigan."

Counsel for complainant also claim that on the examination before the commissioner Mortimer D. Gardner was asked to make a copy of the paper under which he claims; that such paper was dictated to him, and an examination shows that several words so written by Mortimer are misspelled, and that a comparison of this paper with the one in controversy shows that the same words are misspelled in the paper under which claim is made, but in the two papers the words are spelled exactly alike.

Mrs. Wightman testified that Mr. Wightman usually spelled his words correctly, except that he abbreviated the word "received," but that he alwa·s spelled "annually" correctly. The word "whom," in the paper in controversy, is spelled "whoom," and the word "record" is spelled "reccord."

The word "whom," in the copy made by Mortimer on the hearing, is spelled "hoom," but the word "record" is spelled "reccord," the same as in the paper.

It is a curious fact, however, that, notwithstanding the testimony of Mrs. Wightman, her husband was not in the habit of spelling his words correctly, and the same errors of spelling appear in the papers used as exhibits in the case, which

are conceded to be in Mr. Wightman's handwriting; so we cannot attach any importance to the manner in which the words are spelled in this paper.

Our attention, however, is attracted to the phraseology of these two papers. The one produced by Mrs. Wightman is only a copy made by her of a paper which she says her husband said was a copy of a paper given Mortimer. No explanation is given why the one shown her by her husband was not put with the mortgage, and preserved; and it is not produced, or in any manner accounted for. In this copy produced by her, following, as it does, the one in controversy down to and including the word "Michigan," it seems from there on not to have a very fitting termination, while the paper in controversy connects smoothly with what precedes.

It appears also that some time before the commencement of this suit the defendants gave to the complainant a copy of the paper in controversy, which was sent by him to Mrs. Wightman; so that it is as easy to believe that the paper exhibited by Mrs. Wightman was made from this copy sent her by complainant, and the latter part of it changed, as to believe the one produced by defendants was manufactured over from an original which read as the one produced by Mrs. Wightman.

A great amount of testimony is produced, and the record is quite voluminous. The solicitors for the respective parties had certain theories, to meet which witnesses were produced upon either side. We are asked to say upon this record that Mortimer D. Gardner forged this paper, or procured it to be forged. The evidence not only falls short of proving this fact, but the circumstances surrounding the case, and the testimony of the witnesses who had the means of knowing, convince us that the paper is genuine, and satisfy us of the entire innocence of Mortimer D. Gardiner of so great a crime.

It would not be profitable to go over the whole testimony,

as from an examination of the whole record we are led to the above conclusion, and this conclusion is reached without an examination of the testimony of Mortimer D. Gardner and his wife, which complainant's counsel claim to be incompetent under the statute.

We have not discussed this question, as it is wholly immaterial to the result, the other testimony presenting facts conclusive in their nature of the genuineness of the paper in controversy.

The decree of the court below must be affirmed, with costs of both courts.

CHAMPLIN, MORSE, and CAMPBELL, JJ., concurred. SHERWOOD, C. J., did not sit.